**BOARD OF EDUCATION OF CHARLES COUNTY, MARYLAND**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY et al.**

Civ. No. B–74–336.

United States District Court, D. Maryland.

Nov. 20, 1975.

E. Stephen Derby and Edward S. Digges, Jr., Baltimore, Md., Edward S. Digges, La Plata, Md., for plaintiff.

George M. Radcliffe, Baltimore, Md., for defendants.

## MEMORANDUM OPINION

BLAIR, District Judge.

On February 22, 1972, the Thomas Stone High School located in Waldorf, Charles County, Maryland, and owned by the plaintiff was partially damaged by fire. There were in existence at that time policies of insurance issued by the defendants covering fire and other loss.[1] After the fire, plaintiff timely notified the defendant insurance companies and requested payment under the policies for the damages suffered. By letter of September 5, 1972, the defendants denied liability on the ground, *inter alia*, that plaintiff had failed to comply with automatic sprinkler clauses in the policies. This court has jurisdiction under 28 U.S.C. § 1332. The case was tried to the court after waiver of jury trial by all parties.

Since the insurance companies assert that the plaintiff may not recover because it violated the conditions imposed by the automatic sprinkler clauses, the clauses, which are all identical, are set forth in full:

This policy being written at a rate based on the protection of the premises by the sprinkler system, *it is a condition of this policy that, in so far as the sprinkler system and water supply therefor are under the control of the insured, due diligence shall be used by the insured to maintain them in complete working order*, and that no change shall be made in the said system or in the water supply therefor and no unsprinklered additions or extensions shall be made to the building(s) unless immediate notification is given to the Maryland Fire Underwriters Rating Bureau, Baltimore, Md., or to this Company. Permission, however, is hereby given in case of break, leakage, or the opening of sprinkler heads, to shut off the water from so much of the sprinkler system as may be imperatively necessary, it being a condition of this policy that the Maryland Fire Underwriters Rating Bureau, Baltimore, Md., or this Company, will be immediately notified and the protection restored as promptly as possible.

*In the event of failure to comply with the foregoing, this insurance with respect to the peril and at the location affected is suspended during the period of time that the Automatic Sprinkler System is inoperative.* [emphasis supplied].

It is undisputed that the sprinkler system was not on at the time the fire started at the Thomas Stone High School. The issue is whether, nonetheless, plaintiff exercised due diligence in maintaining the sprinkler system. Defendants have advanced a number of additional defenses, but in light of

1. The policies are:
   a. St. Paul Fire and Marine Insurance Co. Policy No. 181–AB–6156;
   b. Reliance Insurance Co. Policy No. FF–7–62–56–53;
   c. Continental Insurance Co. Policy No. FDP–5–82–25–23.

this court's disposition of the case, they need not be considered.

### The Law

"Due diligence is that degree of care which is exercised by ordinarily prudent persons under the same or similar circumstances." *See R. L. Kimsey Cotton Co. v. Pacific Ins. Co.*, 224 Ga. 249, 161 S.E.2d 315, 317 (1968). Defendant has the burden of establishing plaintiff's lack of due diligence to maintain the sprinkler system at Thomas Stone High School. *See Liverpool & London & Globe Ins. Co. v. Nebraska Storage Warehouses, Inc.*, 96 F.2d 30, 34 (8th Cir. 1938). *Cf. Brooks Upholstering Co. v. Aetna Ins. Co.*, 276 Minn. 257, 149 N.W.2d 502, 505 (1967). Further, forfeiture of insurance coverage is not favored and insurance policies are construed to cover all losses proximately resulting from the fire. *See Aetna Ins. Co. v. Getchell Steel Treating Co.*, 395 F.2d 12, 18 (8th Cir. 1968); *Insurance Co. of N. Amer. v. Lapidus*, 210 Md. 389, 123 A.2d 597, 601 (1956); *Transatlantic Fire Ins. Co. v. Dorsey*, 56 Md. 70, 79 (1881); 12 M.L.E., *Insurance*, § 121 (1961); 6A Appleman, *Insurance Law & Practice*, § 4146 (1972). There must be a material breach of a condition subsequent, such as the automatic sprinkler clauses, to constitute grounds for avoidance of the insurance policy. *See* 12 M.L.E., *Insurance*, § 151 (1961). In determining if due diligence has been exercised, this court must analyze the surrounding facts and circumstances. *See Charles Stores, Inc. v. Aetna Ins. Co.*, 428 F.2d 989, 992 (5th Cir. 1970); *R. L. Kimsey Cotton Co. v. Pacific Ins. Co., supra.*

### The Facts

In the court's view, the facts of this case are relatively straightforward and without substantial dispute.[2]

The school was constructed in the late 1960's and had a fire sprinkler system as was required by the Maryland Fire Code. The policies issued by the defendants were effective January 1, 1972 and were delivered to school authorities on January 22, 1972. Before purchasing the policies, the plaintiff had retained the services of the Insurance Buyers' Council, an independent business firm, for advice concerning its insurance needs and to prepare specifications for the purchase of that coverage. With the advice and specifications which plaintiff thus received, it purchased insurance from the defendants with the automatic sprinkler clauses set forth above. Upon receipt of the policies on January 22, 1972, plaintiff promptly referred them to its independent advisor to determine whether they conformed with the specifications. There is no claim that the policies did not. Prior to 1972 the policies in effect did not contain a sprinkler clause.

For some years prior to and at the time of the fire, plaintiff had a policy that schools which had sprinkler systems were to have such systems operative at all times and that shutdowns of the system were to be reported. This policy was not reduced to writing and was disseminated orally from the superintendent's office to the administrative faculty staff and the facilities and maintenance staff. When the insurance policies were issued in January 1972, it was recognized by the superintendent's office and made known to others in authority that not only the fire code but also the insurance policies required that the sprinkler system be kept in an operational condition and that any necessary shutdowns were to be reported to proper authorities. The school superintendent knew this as did the assistant superintendents for instructional-administrative staff and facilities and maintenance. Both testified that they orally made these requirements known to the school employees reporting to them. The principal of Thomas Stone High School was well aware of the policy as were certain of the vice principals. Outside of these precincts the dissemination of the policy is revealed by the evidence to be vague, uncertain and

---

**2.** In finding the facts of this case, the court, after reserving decision at trial, has admitted into evidence plaintiff's exhibits 16 and 17, while not admitting defendants' exhibits 5 and 6.

indifferent. On the main valve of the sprinkler system located in the room housing the school plant, there was a sign indicating that the valve was to be open (operative) at all times. That sign was incomplete in that the space' for filling in the name of the person to be notified if the valve was to be closed (inoperative) was not filled in.

Although not required by the insurance policies to do so, plaintiff had also engaged an independent firm, the Grinnell Company, to make inspections of Thomas Stone High School four times annually which included determination of whether the sprinkler system was operative. Preceding the fire, Grinnell had most recently inspected the system on January 21, 1972. Additionally, the Maryland fire board made annual inspections at the school which included checking the sprinkler system.

Thomas Stone had a principal and three vice principals. The delegation and division of responsibilities among the vice principals was generalized, vague, uncertain, and in some areas seemingly contradictory. Specifically, the authority for control over and operation of the sprinkler system was not clearly delineated. While Chalmers Hammond, second vice principal at Thomas Stone, was acknowledged to be responsible for supervision of the plant facilities, Anthony Guido, first vice principal, was responsible for fire drills, safety, and civil defense, which areas reasonably could encompass the sprinkler system. Additionally, the principal of Thomas Stone, Harold Morton, testified that Guido had "some responsibility" for operation of the sprinkler systems. Hammond testified that Morton had not told him he had direct responsibility for the sprinkler system. Since those in authority were not clear as to who had responsibility for the sprinkler system, it is not surprising that the man in charge of the school plant was also unclear about who had

authority to give him directions concerning the sprinkler system.

Prior to the fire and during the 1971–72 school year, there had been four malicious activations of the sprinkler system.[3] Those activations were disruptive and caused water damage. Guido had at the beginning of the school year inquired of Bruce Bernstein, plant operator at Thomas Stone, how to shut off the sprinkler system. Bernstein testified that Guido was the only administrative official to express interest in the system. The day after that inquiry, a malicious activation occurred and Guido shut off the system. He did not notify anyone of this shutoff, made no efforts to reactivate the system, and doesn't know who reactivated it or when. The evidence suggests that Morton knew that Guido shut off the system. Two more malicious activations occurred, one apparently near the Christmas holidays. The court finds that after at least one of these activations Guido had instructed Bernstein, the plant operator, that the sprinkler system be shut off and left off. The latter part of that directive was apparently not followed since the system subsequently was activated.

On February 10, 1972, the fourth activation occurred. Shortly after the activation Guido told Bernstein in no uncertain terms that the sprinkler system was to be turned off and left off. Several persons overheard Guido's command including vice principal Hammond who, although he recognized it as being contrary to policy, neither questioned Guido's action nor reported it to anyone. Thus, Hammond, who had responsibility for plant operation and was Bernstein's superior, gave the appearance to Bernstein of acquiescing in Guido's directive. The court finds that this occurred on February 10, 1972, that Bernstein, in obedience to the command, shut off the system that day and that it remained off until the fire. As will be developed more fully, the court believes that during this 12-day period no official at

---

3. There was credible testimony that from 1969 to 1972 a dozen such activations had occurred. Additionally, the evidence indicates that members of the superintendent's staff were aware of the malicious activation problem at Thomas

Stone High School prior to the fire. In fact, Morton and Guido had inquired of Lund, supervisor of facilities, prior to the fire at Thomas Stone, if the sprinkler system could be shut off.

Thomas Stone or from the superintendent's office made any attempt to check either directly or by inquiry to the plant operator whether the sprinkler system had been reactivated.

On February 10, 1972, Guido sent the principal of Thomas Stone, Harold Morton, a note reading in relevant part:

Harold:

This is the 4th time this school year that the sprinkler system has been "set off".

The last time, I gave orders to Mr. Bernstein not to refill the pipes. Do you want this to continue? I also told Mr. Pratt not to reset the fire alarm system, but it remains on. What do we do?

Tony

On that date, Morton reiterated to Guido and his other vice principals, Hammond and Richmond, that the system had to remain on. Neither Morton nor any other official at Thomas Stone, however, made any inquiry as to whether the sprinkler system was operative despite the fact that at least one of those officials, Hammond, had heard explicit directions that the system be shut off.

On February 11, 1972, a meeting was held at Thomas Stone with principal Morton and Lawrence Abell, assistant director of school facilities, present throughout and Hammond and Guido present at least while the sprinkler system was discussed. Morton wanted Abell to impress upon Guido the necessity of keeping the sprinkler systems operative to comply with the state fire code and insurance requirements. Morton testified that despite his repeated admonitions to Guido that the sprinkler had to remain operative, Guido continued to express disagreement with that policy. The principal was thus fully aware that Guido was both concerned about the sprinkler system and disagreed with the policy that the sprinkler was to be continuously operative. From the February 10, 1972 note, if not otherwise, Morton was also alerted that Guido had acted contrary to policy by directing that the system be shut down.

Despite these indications that the policy might not be complied with, no one at the February 11, 1972 meeting inquired if the system were operative. Morton's testimony was that he knew Abell was going to talk with Bernstein after the meeting and he believed that Abell would inquire as to whether the system was on and report back to him if it were not. After he left the meeting, Abell, who had a different view of what he was to do, intercepted Bernstein and instructed him on the use of wooden plugs during a malicious activation, but did not inquire if the sprinkler system was operative. Since Abell did not report back to Morton before the fire the principal inferred that the sprinkler system was in fact in working order.

Additionally, prior to the fire no logs or written reports concerning operation of the system were kept so that no regular surveillance procedure insured that the system remained open. There was no policy that shutdowns were to be reported in writing to the superintendent's office or anywhere else and there is no credible evidence that any of the shutdowns during the 1971–72 year had been so reported. Further, the evidence, while conflicting, indicated that no one inquired of the plant operator after an activation to see if the system had been returned to working order. Nor does the evidence indicate that there was a procedure for such a check.

It is clear that the plant operator at Thomas Stone, Bruce Bernstein, was the most familiar and had the most contact with the sprinkler system. Bernstein had been instructed by the contractor who built Thomas Stone on how to turn the sprinkler system on and off and how to drain the system, but no school authorities had ever indicated to Bernstein that the sprinkler was to remain on at all times. While Bernstein had seen the sign, affixed by the contractor, behind the sprinkler system valve indicating that the system was to remain on at all times and regarded it as an instruction, he also was not aware of plaintiff's policy and clearly felt that the com-

mand of a vice principal took precedence over the sign's instruction.

Further, testimony in the case disclosed considerable confusion as to whether Bernstein or Fred Pratt, the head custodian at Thomas Stone, had ever received training from school officials about operation of the sprinkler system. Assistant superintendent Runyon stated the Board's policy would be for the two to receive such instruction but he conceded he didn't know if they actually received any. Abell, supervisor of facilities for the Board of Education, could not recall if Pratt or Bernstein received training. Morton, principal at Thomas Stone, testified that he thought Bernstein was sent to training school to learn about sprinkler systems. Given these uncertainties, the court finds the more convincing evidence to be Bernstein's testimony that no school authorities had ever trained or instructed him on the sprinkler system and Pratt's testimony that he did not know how to operate the sprinkler prior to the fire on February 22, 1972.

Finally, on the day of the fire, the evidence indicates that the two people on the Thomas Stone staff who could activate the sprinkler system, Hammond and Bernstein, were absent.[4] On that day, the superintendent's office sent Roger Cross to substitute for Bernstein. Cross knew how the sprinkler system operated but at no time prior to the fire on February 22, 1972 did he check to determine if the system were on. Sometime after the fire commenced, the best evidence indicating about thirty minutes subsequent to discovery of the fire, John Carroll, then with the State Fire Marshal, activated the system upon determining from the Waldorf Fire Chief that the system would aid the firefighters.

In summary, these important facts emerge from the evidence. Although the plaintiff was not expressly required by the insurance policies to either adopt or dissem-

inate a policy concerning the sprinkler system, it in fact did so. In so doing it chose the least effective manner to clearly set forth and communicate that policy. Within the Thomas Stone school, the areas of responsibility were ill defined and clearly confusing to those at the vice principal level. No one at Thomas Stone at the vice principal level had clear responsibility for the sprinkler system. Bernstein, who operated the plant which included the sprinkler system, had never been told of plaintiff's policy regarding the sprinklers and was not clear about which vice principal had authority to direct him in this area. Pratt, the head custodian, neither knew of the policy nor how to operate the sprinkler system before the fire. The sprinkler system had been shut down on a number of occasions before the fire without any report to higher authority being made. No logs or records concerning the operational status of the system were kept before the fire.

Further, principal Morton and vice principal Hammond had every reason to know of Guido's concern about malicious activations and his desire to have the system shut off. Notwithstanding this knowledge, reinforced by Guido's note of February 10 and the meeting of February 11, no one in authority at Thomas Stone or from the superintendent's office inquired about or checked to see whether the system was on at anytime between February 10 and February 22. It was off the entire time. Had the system been operational on February 22, it would have substantially retarded the progress of the fire and the damage and loss that ensued therefrom would have been substantially less.

### Conclusion

In light of these factual findings, it cannot be said—as plaintiff urges—that Guido's command to Bernstein, which was obeyed, was merely a negligent unauthorized act which does not preclude the plain-

---

**4.** Guido testified without contradiction that he knew only how to shut off the system and was not aware of how it could be reactivated. This is plausible since complete deactivation involves not only closing the main valve but draining the system by opening another valve. Reactivation requires closing the drain valve and opening the main valve. Guido testified he knew nothing about the drain valve.

tiff from collecting under the insurance policies. To the contrary, the court concludes, from a preponderance of the evidence, that as· a matter of fact and law the plaintiff failed to use due diligence to maintain the sprinkler system in working order and is not entitled to recover for its losses from these defendants.

The court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure are contained herein even when not expressly so characterized.

Judgment shall be entered separately in favor of defendants, St. Paul Fire and Marine Insurance Company, The Continental Insurance Company, and Reliance Insurance Company.

## ADDENDUM

The parties agree that Maryland law controls the disposition of this case. To the extent that Maryland law does not contain direct authority for any of the propositions contained herein, the court has accepted the legal principles applied in other jurisdictions which it concludes would be applied by Maryland courts under similar circumstances.