**SFI, INC.**

**v.**

**UNITED STATES FIRE INSURANCE COMPANY.**

**Civ. A. No. 76–226.**

United States District Court,
M. D. Louisiana.

June 19, 1978.

---

**9.** Defendant has abandoned its claim for monetary damages.

Edwin A. Smith, Jr., Smith & Gaudin, Baton Rouge, La., for plaintiff.

Ernest L. O'Bannon, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, La., for defendant.

E. GORDON WEST, District Judge:

Sometime between midnight, Saturday, October 18, 1975, and 7:00 a. m. Monday morning, October 20, 1975, the office trailer and main workshop of SFI, Inc., an industrial pump repair company located in Zachary, Louisiana, was burglarized. Tools and equipment valued between $19,257.63 and $21,078.65 were stolen. At the time of this burglary a multi-peril insurance policy issued by the defendant, United States Fire Insurance Company, was in effect covering theft and other losses. After the burglary, the president of SFI, Inc., Chester Efferson, notified the defendant of the burglary. The defendant investigated, but did not deny or affirm coverage for several months, the exact time lapse being unclear in the record. Eventually the defendant did deny coverage on the grounds that the plaintiff failed to comply with the protective safeguards clause of the policy. The plaintiff then brought suit against the defendant insurance company to compel payment under the policy. The case, removed from the 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana on the basis of diversity jurisdiction, 28 U.S.C. § 1332(a) and 28 U.S.C. § 1441(a) and 28 U.S.C. § 1446, was tried without a jury.

The sole defense of the insurance company is that the plaintiff allegedly failed to comply with certain clauses of the policy. The pertinent clauses provide that:

"It is a condition of this insurance that the insured shall maintain so far as within his control such protective safeguards as are set forth by endorsement hereto.

"Failure to maintain such protective safeguards shall suspend this insurance, only as respects the location or situation affected, for the time of such discontinuance."

The protective safeguards clause states:

"In consideration of the premium at which this policy is written, based on the protection of the premises by the protective safeguards system described below (local alarm, with telephone dialer service) (sic), it is a condition of this policy that, the insured shall exercise due diligence in maintaining in complete working order all equipment and services pertaining to the system and the insured shall give immediate notice of any impairment in or suspension of such equipment or service (within the knowledge of the insured) to this company."

It should be noted at the outset that this defense applies only to the coverage of tools and equipment located in the main workshop as this protective safeguards clause did not at the time of the theft apply to the office trailer.

A preponderance of the evidence in this case indicates that the burglar alarm system, while apparently in working condition, was not turned on at the time of the burglary. It is for this reason that the defendant asserts that the plaintiff failed to comply with the protective safeguards clause by failing to "exercise due diligence in maintaining the system." Irrespective of the fact that the system was not turned on, the plaintiff asserts three theories of recovery; (1) "due diligence" to maintain the system does not require the system to be "on" but merely in good working order; (2) delay in notifying the plaintiff of the denial of coverage until after the receipt of a subsequent premium payment estops the defendant from asserting the denial of coverage, and (3) the one failure to activate the system does not qualify as a failure of "due diligence in maintaining" the system in working order.

After the initial policy was issued in May of 1973, the defendant requested but did not require that the plaintiff install a burglar alarm system. The plaintiff complied with this request by installing a burglar alarm system which sounded an alarm on the premises and dialed the pre-selected telephone numbers of two employees of SFI, Inc., the Zachary Police Department and the East Baton Rouge Sheriff's Department. After the defendant was notified that the system was installed, it issued the protective safeguards clause and required the clause to be incorporated into the policy without any reduction in premium. This occurred on April 28, 1975, and was in effect with respect to the workshop at the time of the burglary.

Between midnight, Saturday, October 18, 1975 and 7:00 a. m. Monday morning, October 20, 1975, someone cut the hurricane fence surrounding SFI, Inc. and broke into the office trailer and main workshop. Using one of the plaintiff's pickup trucks, the burglars removed between $19,257.63 and $21,078.65 worth of tools and equipment. This difference in amounts results from a failure of the parties to agree as to whether or not a roll of monel wire having a value of $1,821.02 was taken in the theft. Otherwise the parties have agreed by stipulation to the amount of damages. At no time did the alarm system sound an alarm or dial any of its pre-selected numbers. The two employees, as well as representatives from the East Baton Rouge Sheriff's Department and the Zachary Volunteer Fire Department (who handle weekend calls for the Zachary Police Department) testified that no calls were received by them. Chester Efferson stated that he did not think the alarm system was activated at the time of the burglary and Glen Brown, a former employee of SFI, Inc., told Officer Dunaway of the Zachary Police Department that the system had not been turned on.

The burglar alarm system is not complicated but does require knowledgeable implementation. All personnel have to be out of the building and all doors and windows must be closed and locked before activating a series of key-switches on the office trailer and the workshop. Four keys exist which may activate the system. Chester Efferson, Wayne Cavin, and Billy Lively each had one. The other one is left in a drawer of the workshop during the day and is removed and used by the last shift foreman of the day, either Glen Brown or Ed Shaneyfelt, when he leaves. Each of these men had been individually instructed in the mechanics of closing down the business and activating the system and each knew when it was his responsibility to activate the system. There existed a clear-cut procedure whereby the last supervisory employee left on the premises was in charge of activating the system after all employees had left. Although there is dispute as to who the night shift foreman was the night of Saturday, October 18, 1975, there is no dispute as to what supervisory employee was to close up—the night shift foreman. There was no confusion resulting from overlapping responsibilities or the simultaneous presence of two supervisory employees.

In summary, the facts are rather simple and undisputed. When the shop closed down Saturday night, the night shift foreman failed to activate the system—a job he had been trained to do and one which he knew he was supposed to do. When the burglars broke into the workshop, no alarm went off, no one was called, and consequently, no one discovered the burglary until Monday morning when SFI, Inc. opened for business.

■ The plaintiff's first contention, that the protective safeguards clause only required the system to be in working order but not "on," is an attempt to have the clause interpreted narrowly—much too narrowly for this Court to accept. To interpret "due diligence in maintaining the system in working order" in this fashion would be to utterly disregard the reason for insertion of such a clause. Clearly the whole point of requiring any alarm system was to frustrate burglars and lessen the chance or amount of loss, and the resulting liability of the insurance company. Such a construction would render the clause meaningless. Furthermore there exists no evidence that any officer of SFI, Inc. interpreted the clause in such a manner, or that they were in any way mislead as to the requirements of the clause. Louisiana law mandates that a clause be interpreted as the parties intended and without ridiculous results. Louisiana Civil Code article 1945 states in pertinent part:

"Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:

\* \* \* \* \* \*

Third—That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences; \* \* \* "

This principle is backed by legend case law. *Ainsworth v. Association Life Ins. Co.,* 325 So.2d 708 (La.App.1976); *Lanneau v. Capital Transportation Corp.,* 292 So.2d 810 (La.App.1974); *Crow v. Monsell,* 200 So.2d 700 (La.App.1967); *Texaco, Inc. v. Vermilion*

*Parish School Board,* 244 La. 408, 152 So.2d 541 (1963).

■ According to the evidence the defendant did not notify the insured of its decision to deny coverage until after the plaintiff renewed its policy by submitting another premium payment to the insurer. In fact, the defendant did not notify the plaintiff of its denial of coverage until the plaintiff had complained of the non-payment and sought relief from the Louisiana State Insurance Commission. The plaintiff asserts that this subsequent acceptance of a premium payment estops the defendant from asserting the failure of a breach of a condition as a defense. Plaintiff cites to the Court numerous cases stating general principles of estoppel, but little which aids in resolving the problem at hand. One case was found, although not a Louisiana case, which holds that acceptance of a premium after knowledge by the insurer of the non-compliance of a condition of the contract is grounds for asserting estoppel. *Continental Insurance Company v. Thrash,* 223 Miss. 344, 78 So.2d 344 (1955). See also *Appleman, Insurance Law and Practice* § 9293. But in the present case no evidence was produced which proved or even suggested that any agent of the defendant, at the time of the acceptance of the premium, knew that the plaintiff had been determined to be in violation of any such condition. Without any such proof the claim of estoppel under this theory must fall. Furthermore an essential element of the theory of estoppel in Louisiana is detrimental reliance. *Turner v. Ewing,* 255 La. 659, 232 So.2d 468 (1970); *McDonald v. Champagne,* 340 So.2d 1025 (La.App.1976); see also *Appleman, Insurance Law and Practice* § 9088. No harm was proved to have resulted from the defendant's delay in notifying the plaintiff of its denial of coverage. Plaintiff asserts only the speculative supposition that he may have changed insurance companies instead of paying another premium to the defendant. Such speculation alone will not stand as justification for this Court to apply the theory of estoppel.

The final question before us is whether the one negligent act of the shift foreman in not properly activating the system qualifies as a failure to "exercise due diligence in maintaining in complete working order all equipment and services pertaining to the system * * *." "Due diligence in law means everything reasonable and not everything possible." *Cameron v. Lane*, 36 La.Ann. 716 (1884) at 721. "Due diligence is that which is expected of persons of ordinary prudence under similar circumstances * * *." *Saulters v. Sklar*, 158 So.2d 460 (La.App.1963) at 462. The defendant has the burden of establishing the plaintiff's lack of due diligence, *Board of Education of Charles County v. St. Paul Fire and Marine Insurance Company*, 420 F.Supp. 491 (D.Md.1975) (hereinafter *Board of Education,*) and the applicability of exclusions in the law. *Sparkman v. Highway Insurance Company*, 266 F.Supp. 197 (W.D.La.1967). See also *Appleman, Insurance Law & Practice* § 4146. Above all, however, the Court must analyze and consider the surrounding facts and circumstances to determine whether due diligence has been exercised. *Charles Stores, Inc. v. Aetna Ins. Co.*, 428 F.2d 989 (CA 5—1970).

The plaintiff quotes in its brief from *Charles Stores, Inc. v. Aetna Insurance Co.*, 490 F.2d 64 (CA 5—1974) because of what he claims to be its similar facts and language beneficial to his cause. In so doing, however, the plaintiff left out selected portions of quotations which render that case inapplicable. In that case there was strong evidence that a third person, apparently the arsonist, tampered with the sprinkler system prior to the fire. The Court there refused to extend the insurer's claim of noncompliance by the insured to such acts of a third person. It was these portions of the quotations which referred to the activities of the third person which were excised.

*Board of Education*, supra, involved interpretation of the clause "due diligence shall be used by the insured to maintain them [the sprinkler system and water supply] in complete working order." There the sprinkler system (which for purposes of this issue is analogous to the burglar alarm system) was not on at the time of the fire and for that reason the insured denied coverage. Rather than simply hold for the insurer because the system was not on, the Court analyzed certain criteria to determine if due diligence had been used. In so doing the Court considered the delegation of authority involved in maintenance and operation of the system, the time element involved and the training procedure undertaken by the insured. These same criteria must be considered in the present case.

In *Board of Education* there was great confusion among vice-principals in the school as to who was in charge of the sprinkler system. One would tell the janitor to turn the system off, because of vandalism, and the other would insist that it be on. No one knew exactly when the system was to be on, as no procedure for such authority had been established. In the present case, there was no such confusion. Each supervising employee testified that he knew when to activate the system—when he had been supervising and was the last one to leave. The procedure was not inadequate. It was the night shift foreman's failure to follow that established procedure that was inadequate.

The second factor to consider is the time element. In *Board of Education* the Court noted that the sprinkler system had not been inspected for twelve days. But in the present case the elapsed period was no more than one and one-half days. This factor's importance is compounded by the difference in the very nature of the two systems discussed. A sprinkler system must be operable at all times and thus periodic inspection must be made to make sure that the system is fully operable. A burglar alarm system on the other hand is activated and deactivated almost daily, each time the business is opened or closed. Therefore, a burglar alarm system by its very nature is, in a way, inspected each day. It is far more reasonable to require inspection of a constantly operating sprinkler system than an intermittently operating burglar alarm system.

In *Board of Education* there arose great confusion as to whether the janitor had received any training in operating the system. In the present case, no such confusion existed. Both Glen Brown and Ed Shaneyfelt testified without contradiction that they knew full well how to operate the system.

The defendant cites to the Court *Phoenix Ins. Corp. v. Ross Jewelers, Inc.*, 362 F.2d 985 (CA 5—1966). In that case the Fifth Circuit Court of Appeals reversed the District Court on its finding that the insured had maintained protective safeguards devices. That case involved a jewelry store wherein there existed two separate alarm systems, one for the door of the store and one for the vault. Both systems were activated at the close of the business day but the key to the vault system remained in the switch under a counter. The thief broke through a wall without setting off the door alarm and deactivated the vault system by using this key. It had been the custom of the store to so leave the key in the switch, unattended. The major reason for the reversal by the Fifth Circuit was that it was the *custom* of the store operations to leave the key unattended in the switch after hours. At SFI, Inc. no such custom existed. There was no proof here that the key to the system was left unattended on the premises after hours. On the contrary, whenever the business was shut down one of the shift foremen had the key with him. The only time the key was left on the premises unattended was at the change of shifts. That case is distinguished from the present case, as was *Board of Education,* because there the procedure itself was inadequate, rather than merely the compliance with the procedure.

In summary it appears that the insured, SFI, Inc., did all that could be reasonably expected to assure that the system was operational; an approved burglar alarm system was installed, each responsible employee was trained in the operation of the system, and it was made clear to the employee in charge at the end of the day that he was to activate the system.

With the language of *Charles Stores, Inc. v. Aetna Ins. Co.*, supra, in mind, i. e., "the court must analyze the surrounding facts and circumstances," this Court concludes that the insured did all that could be reasonably expected to ensure that the system was operational. The company installed an approved burglar alarm system, it trained each responsible employee in the operation of the system, and it made clear to the employee in charge at the end of the day that he was to activate the system.

With regard to damages, it is the plaintiff's burden to prove those damages which he has sustained. *Louisiana Power and Light Co. v. Sutherland Specialty Co.*, 194 F.2d 586 (CA 5—1952); *Tadin v. New Orleans Public Service*, 226 La. 629, 76 So.2d 910 (1954); *Cheramie v. Jones*, 327 So.2d 601 (La.App.1976). In this case, the plaintiff has done so with respect to all except the monel wire. There is simply a failure on the part of the plaintiff to develop any connexity between the loss of the monel wire and the burglary. It was discovered missing long after the burglary and it did not show up on any inventory lists until after this suit had been filed. No satisfactory reason was given for such an inordinate delay. The plaintiff should not be allowed to recover the value of the monel wire.

The plaintiff also seeks a penalty and attorney's fees under La.R.S. 22:658 for the defendant's alleged failure and refusal, arbitrarily, capriciously, and without probable cause, to pay the claim. Such penalties and attorney's fees should not be awarded where a reasonable defense had been presented in good faith. *Wisconsin Barge Line, Inc. v. Coastal Marine Transport, Inc.*, 414 F.2d 872 (CA 5—1969); *Soniat v. State Farm Mut. Auto. Ins. Co.*, 340 So.2d 1097 (La.App.1976). The issue of the applicability of the defense was not so clearcut that its assertion could be called unreasonable. This Court denies the plaintiff's request for a penalty and attorney's fees.

For these reasons, the Court concludes that the evidence in this case preponderates

in favor of a holding that, as a matter of fact and law, the plaintiff did use due diligence in complying with all of the terms and conditions of the insurance policy in question and that the plaintiff is entitled to recover from the defendant the sum of $19,-257.63, together with interest at the legal rate from the date this suit was filed until paid, and for all costs, properly assessable, of this suit. Judgment will be entered accordingly.