The **CHARLES STORES, INC.,**
Plaintiff-Appellee,

v.

**AETNA INSURANCE COMPANY,**
Defendant-Appellant.

The **CHARLES STORES, INC.,**
Plaintiff-Appellee,

v.

**HARTFORD FIRE INSURANCE COMPANY,** Defendant-Appellant.

No. 72-1787.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 1974.

---

38. Transcript at 65–79a.

Fred C. DeLong, Jr., Greenville, Miss., Thomas H. Watkins, Jackson, Miss., for defendants-appellants.

Joseph S. Mead, Birmingham, Ala., Philip Mansour, Greenville, Miss., for plaintiff-appellee.

Before GEWIN, BELL and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

On the first appeal in this suit over the proceeds of fire insurance policies on a Mississippi ˙building we reversed a jury verdict for the insurers because evidence that the insurers had waived policy defenses was erroneously excluded. 428 F.2d 989 (CA5, 1970). Following a second jury trial the court entered judgment for the insured in the amount of $199,572.82 based on the jury's answers to special interrogatories. The insurers appealed.

## I

■ The insurers were not entitled to a directed verdict on the ground that as a matter of law the insured had failed to comply with the protective safeguard provision of the policies:

PROTECTIVE SAFEGUARDS: It is a condition of this insurance that the Insured shall maintain so far as is within his control such protective safeguards as were stipulated in the application for this insurance or for which credit in rate has been granted. Failure to maintain such protective safeguards shall suspend this insurance only as respects the location or situation affected for the time of such discontinuance.

A credit in the rate was granted because of the existence of interconnected sprinkler and alarm systems. When firemen arrived at the fire the water valve for the sprinkler system was turned off, which also disconnected the alarm system. Additionally, a screw connection in the alarm system was found unfastened the next day. The insurers claimed that the fact that the sprinkler system was off was a breach of warranty which terminated the coverage. Accepting arguendo that a breach of the above-quoted provision would terminate coverage, there was evidence that the sprinkler system was repaired and found to be in working order two days before the fire. The jury could infer that the fire, which, without dispute, was of incendiary origin, was set by persons whose acts were not chargeable to the insured and that whoever set the fire disengaged operative safeguard devices, and that, therefore, the insured complied with its duty to maintain the system "so far as is within his control." Neither the language of the policy nor the cases cited[1] support an interpretation of the policy so sweeping as that urged by appellants—that the insured is a guarantor of the continuing effectiveness of safeguard devices so long as it is in control of the premises and that such guarantee is breached and coverage suspended if the cause for the inoperative condition of safeguards is the act of persons other than the insured done concurrently with the fire itself. An insured's overall control of the premises does not give it control in the sense that it can prevent the act of an arsonist who cuts off the sprinkler system while setting a fire. To assure itself, under appellants' construction, of the benefits of a safeguards clause the insured would have to keep a watchman on the premises. Presumably if the fire itself rendered the safeguards inoperative the insurers would not claim coverage was suspended. We perceive no difference if, as the jury could find, the safeguards were disengaged by the person who started this incendiary fire.

## II

■ The insurers say that the trial court did not submit to the jury the protective safeguard defense, or if submitted the submission was not correct. Interrogatories Nos. 7 and 10 read as follows:

Interrogatory Number 7: Do you find from a preponderance of the evidence that the sprinkler system in the Charles Store was cut off, the electric alarm system in said store was disconnected and an incendiary device, consisting of a sun lamp attached to an electrical plug was embedded in a stack of towels, by an agent or officer of plaintiff corporation while acting within the performance of his duties as such officer or agent, in the furtherance of the business of plaintiff

---

1. E. g., policy with a watchman clause and no watchman is maintained by the insured. Coleman Furniture Corp. v. Home Insurance Co., 67 F.2d 347 (CA4, 1933); Atlas Assurance Co. v. Standard Brick and Tile Corp., 264 F.2d 440 (CA7, 1959); Kinchen v. Lexington Insurance Co., 292 F.2d 581 (CA5, 1961). A situation comparable to that which the jury could find existed in the present case but arising under a watchman clause would be one where there was evidence supporting findings that the watchman was on duty but was knocked unconscious by an arsonist setting the premises afire.

corporation and in its interest, and with the knowledge, authorization, consent or ratification of Charles D. Saunders?

Answer: No.

\* \* \* \* \* \*

Interrogatory Number 10: Do you find from a preponderance of the evidence that at the time of and before the fire the sprinkler system and electric alarm device in the store were not in good working order and that such condition increased the hazard of fire in the Charles Store building? Answer "Yes" or "No".

Answer: No.

There was no objection to either interrogatory. Nevertheless appellants say on appeal that interrogatory 10 was not a proper submission to the jury because: (a) it is undisputed that before the fire the sprinkler system was not in working order, and (b) the protective safeguard provision of the policy has no relationship to increase in hazard because the mere fact of inoperative safety devices terminates coverage without regard to hazard. The second clause of the interrogatory is, as appellants say in (b), probably not relevant to the protective safeguards clause. The linchpin of appellant's argument is not, however, the giving of the irrelevant second clause of the interrogatory but the theory that the undisputed evidence required an affirmative answer to the first clause, and, since no one would disagree that safety devices not in working order would increase the hazard, the only permissible answer to interrogatory 10 was "Yes," and the jury having answered "No" the answer must be set aside as unsupported by the evidence. This argument collapses because the linchpin fails. There was evidence that two days before the fire the sprinkler system was repaired and put in good working order. The jury was free to conclude that the devices were operative up to the time of the fire.

The District Judge pointed out in his order denying appellant's post-trial mo-

tions that he considered the evidence conclusively to show that whoever set fire to the store disconnected the safety devices (and at several places in the charge he referred to this as a fact), and he considered (as do the appellants) that no one could disagree that this increased the hazard, thus what interrogatory 10 was designed to do, and did do, was submit the question of whether before the safety mechanisms were disconnected they were in good order. The trial judge went on to say:

Defendants' objection and criticism of the interrogatory on this ground have been raised for the first time after the verdict. It is evident that defendants' counsel, at the trial stage, interpreted the interrogatory as does the court; otherwise counsel would have made the objection known to the court at the trial and before the case was submitted to the jury.

The court does not believe the jury was mislead [sic] by the interrogatory. The jury's response establishes the fact that the systems were in good working order at the time of and before the fire, that is to say, before the systems were tampered with by the person or persons who caused the fire.

Interrogatory 7 established that the setting of the fire and the concurrent cutting off of the sprinkler system were not done with the knowledge, consent (etc.) of the insured. In summary, the trial judge pointed out in his statement of reasons that Interrogatory 10 established that before the fire the safeguards systems were in proper working order; that the evidence conclusively showed that at the time of the fire they were turned off by whoever set the fire; and that Interrogatory 7 established that plaintiff neither knew of nor consented to the setting of the fire and the concurrent cutting off of the sprinkler system. We think that the absence of objections to the form of interrogatories 10 and 7 and the application of the answers by the trial court, as authorized

by F.R.Civ.P. 49(a) [2] and as explained in the post-trial order, dispose of appellants' contention.

## III

■ The appellants offered and the trial court excluded statistical data tending to show that in its fiscal year ending two months before the fire the insured's financial position had deteriorated and, as of the end of the fiscal year, was poor. This evidence was offered on the theory that it was evidence of an increase in "moral hazard" to be considered by the jury in connection with the policy provisions saying:

THIS COMPANY SHALL NOT BE LIABLE FOR LOSS OCCURRING (a) while the hazard is increased by any means within the control or knowledge of the insured.

We cannot say that the exclusion was error. The Aetna policy was issued two days before the fire, the Hartford policy approximately six months before the fire. There is no showing to us that the financial data in question tended to establish any increase of hazard after the date of issuance of either policy. The excluded evidence consists of a certified public accountants' report covering Charles Stores' fiscal year beginning September 1, 1963 and ending August 31, 1964. Obviously this data relates not at all to any period subsequent to issuance of the Aetna policy on November 16, 1964. Except for gross sales figures,[3] the data was not broken down by months or quarters but rather was computed for the entire fiscal year. Consequently the most that appellants could have demonstrated by its use would have been that the Hartford policy, issued on June 5, 1964, was issued during the last quarter of a fiscal year during which the financial picture of the insured darkened, that is, that Hartford undertook coverage of a deteriorating insured. The direction or magnitude of changes in the insured's financial condition in the period subsequent to issuance of the Hartford policy cannot be accurately inferred from this limited data.

Additionally, no authority is cited which, in our view, indicates that Mississippi would adopt a rule that increase in hazard "by any means within the control or knowledge of the insured" includes a worsening financial condition of the insured unaccompanied by any physical change in the condition, usage, or occupancy of the premises.[4]

2. "If . . . the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accordance with the judgment on the special verdict."

3. It is doubtful that the monthly gross sales figures, standing alone, could reasonably be taken to imply anything at all about changes in the overall financial condition of the Charles Stores. In any event, the figures for June, July and August of 1964—the only months subsequent to issuance of the Hartford policy covered by the data—show gross sales in the Greenwood store at which the fire occurred of $36,277.30, $34,836.13, and $32,841.25 respectively. By way of comparison, the figures for June, July and August of the prior fiscal year were $10,068.00, $7,-949.00, and $7,232.08 respectively, and the figures for March, April and May of 1964— the three months prior to issuance of the Hartford policy—were $18,462.20, $21,754.37, and $36,350.30 respectively. Thus to the extent that any inference could rationally be drawn from the monthly sales data, it could only be one favorable to the insured.

4. See Western Assurance Co. v. McPike, 62 Miss. 740 (1885) (where residential premises were abandoned by insured, occupied without authority by a non-paying squatter and converted into a retail liquor house, directed verdict for insurer was required under policy stipulation that if insured premises were unoccupied for more than 30 days or were used and occupied so as to increase risk, policy would be void.) ; Frisby v. Central Mutual Ins. Co., 238 Miss. 538, 119 So.2d 382 (1960) (where policy contained provision that failure of insured mortgagee to notify insurer of any "increase in hazard" known to him would void the policy, and mortgagee knew that premises insured as a grocery store were being used as a "juke joint," the question whether sale of

■ A part of the incendiary means employed to set fire to the instant premises was a sun lamp. The appellants offered evidence that approximately six months earlier an abortive effort had been made to set fire to another store owned by the insured in a different city, and that the same sun lamp was claimed to have been part of the incendiary scheme that was there unsuccessfully used. This evidence was not offered as tending to prove that the insured had set both fires. Rather the insurers represented to the trial court that they did not claim arson by the insured. See footnote 4, *supra*. The proffer was upon the theory that the mere presence in the premises of this common electrical appliance, allegedly once used to attempt to start a fire in another store of the insured, demonstrated indifference and apathy by the insured to the possibility that the appliance might again be used for a similar unlawful purpose by someone other than the insured and thus was probative of an increase in hazard. We agree with the District Judge who excluded this evidence as too tenuous for the purpose for which it was offered.

See, as to an even less attenuated situation, 8 Couch, Encyclopedia of Insurance Law (2d), § 37:715, p. 327:

> The mere possibility that an unsuccessful attempt by an unknown person to burn an insured building may be repeated, coupled with failure to take any adequate measures to prevent it, or to notify the insurer, is not an increase of hazard which will avoid the policy, under a provision that it shall be void if the hazard is increased by any means within the control or knowledge of the insured.

See also, 5 Appleman, Insurance Law & Practice, § 2942, p. 17.

### IV

■ There was evidence that in the course of a post-fire count of merchandise made for the purpose of calculating the value of inventory, items of the value of approximately $1,500 were counted twice at the direction of Virgil Thompson, an officer of the insured. The policies provided:

> This entire policy shall be void if, whether before or after a loss, the in-

---

liquor and related activities was an "increase in hazard" was properly submitted to the jury which found for the insurer.) ; Zepponi v. Home Ins. Co., 248 Miss. 828, 161 So.2d 524 (1964) (clause in a fire insurance contract prohibiting other insurance is a reasonable provision designed to prevent fraud or carelessness and violation of the provision avoids the policy.).

Future Realty, Inc. v. Fireman's Fund Ins. Co., 315 F.Supp. 1109, 1116 (S.D.Miss.1970), refers to a purported definition of moral hazard in a Mississippi case, Phoenix Ins. Co. v. Haney, 235 Miss. 60, 108 So.2d 227 (1959). The "definition" is from an instruction given by the trial court in *Phoenix* at the instance of the defendant-appellant, against whom the jury found. Thus its correctness was neither before the Mississippi Supreme Court for approval nor approved. Even if the definition—i. e., "any change in the insured property that increases the probability of destruction by the owners or others"—represents the Mississippi rule, in *Future Realty* there were such changes "in the insured property," accompanied by adverse financial circumstances of the insured, while in the instant case the proffer was of changes

in financial circumstances unaccompanied by changes in the property.

Compare Esbjornsson v. Buffalo Ins. Co., 252 Minn. 269, 89 N.W.2d 893 (Minn.1958) : "A homeowner would indeed be startled to learn that the insurance policy on his home was void because, subsequent to its issuance, he had sustained a minor or major financial loss."

Arguably an insurer can expect financial ups and downs by the owner or occupant of insured business premises and does not anticipate being bound only on the upswing.

While we need not pass on his rationale, we note that the trial judge in the present case considered financial deterioration relevant only if there was a contention, supported by the evidence, that the insured itself had sought to burn the building for its own advantage. The insurer, after asserting at the first trial arson by a corporate officer, affirmatively represented to the trial court at the second trial that it did not claim arson by the insured and expressly took the position that financial adversity of the insured was evidence of increase in moral hazard suspending coverage even if the fire were the work of a stranger.

sured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

The position of insurers is that the jury's answers to interrogatories with respect to this issue required entry of judgment for defendants. Pertinent interrogatories are numbers 3, 4 and 5. Numbers 3 and 4 are:

Interrogatory Number 3: Do you find from the preponderance of the evidence that during the taking of the physical inventory after the fire, goods were counted more than once, and such double count materially increased the aggregate inventory used to finally calculate the actual cash value of such inventory? (If answer is No do not answer # 4.)

Answer: Yes.

Interrogatory Number 4: Do you find from a preponderance of the evidence that such double count was done pursuant to the instructions given by Virgil Thompson, as Vice-President and General Manager of Charles Stores, Incorporated, with the knowledge of such double count and with the intent to defraud defendants? Answer Yes or No.

Answer: Yes.

Interrogatory 5 related to whether Thompson in directing the double count was acting in his own behalf or on behalf of the corporation. Initially the interrogatory was inaptly worded, but after it was amended and explained at some length the jury answered unequivocally that Thompson was acting on his own behalf and not for the company.

The appellants urge, however, that they are entitled to entry of judgment because it is undisputed that the existence of the double count was known to Lucien Hill, the store manager, and that Hill's knowledge is imputed to the insured. Accepting that as correct does not, however dispose of the question of whether the insured, knowing what Hill knew, "impliedly concealed or misrepresented" or engaged in "fraud or false swearing." The jury found that Thompson was acting fraudulently but for his own purposes and adversely to the interest of the corporation. Whether Hill's knowledge of Thompson's actions, as imputed to the corporation, constituted fraud or wilful concealment or misrepresentation was not the subject of any interrogatory and was, therefore, by Rule 49(a) left to be the subject of a finding made or deemed to be made by the court. A trier of fact could conclude that, insofar as Hill (and thus the corporation via Hill) was aware, Thompson's acts were no more than negligence, inadvertence or simply errors occurring in the mechanical task of determining in a relatively short period of time, by physical count of a great number of items, what was on hand. Additionally, on the issue of the insured's state of mind concerning the fact of a Thompson-directed double count, the president of the insured testified that the day after the inventory, Hill told him of the double count and he (the president) told the insurance companies about it.

## V

■ The trial court allowed interest on the judgment from April 13, 1965, a month after the proof of loss was filed, under the discretionary power recognized by the Mississippi Supreme Court in Commercial Union Insurance Company v. Byrne, 248 So.2d 777 (Miss.1971). We cannot say that the discretion was abused.

Affirmed.