313 So.2d 317 (1975)
William F. GALLOWAY, Jr.
v.
TENNECO OIL COMPANY.
No. 6660.
Court of Appeal of Louisiana, Fourth Circuit.
May 15, 1975.
Rehearing Denied June 11, 1975.
Writs Refused September 11, 1975.
*318 Edward J. Demartini, Christenberry, Bruneau & Miller, Lee R. Miller, Jr., for plaintiff-appellee.
Monroe & Lemann, Andrew P. Carter, David E. Walker, New Orleans, for defendant-appellant.
Before GULOTTA, STOULIG and BOUTALL, JJ.
GULOTTA, Judge.
This is an appeal from a judgment in favor of plaintiff for damages arising out of defendant's breach of an obligation to purchase certain real property.
On September 14, 1970, defendant purchased an option to buy certain real estate designated as Lot 2A of Square "F" Pare Fontaine Extension No. 2 in New Orleans. *319 The square is subdivided into two parcels: Lot 2A and Lot 2B.[1] On December 10, 1970, Tenneco timely exercised their option to purchase the property, but subsequently refused to take title. The purchase price for Lot 2A was $150,000.00. Subsequently, the entire square was sold to third parties. This suit followed, seeking special damages (stipulated) totalling $4,921.79 as well as general damages for loss of profits because of the subsequent sale to third parties at a price below the market value. Judgment was rendered in favor of plaintiff in the sum of $61,902.79. This award includes the stipulated damages together with $56,981.00 for loss of profits. Defendant appeals.
It is defendant's position, on appeal, that plaintiff was unable to obtain a title insurance binder showing a good and merchantable title free from zoning restrictions prohibiting the use of the property as a service station in accordance with Sec. 5 of the printed provisions of the Option to Purchase which reads as follows:
"Buyer will procure at its expense, with thirty (30) days after the exercise of option by Buyer, an owner's title insurance binder covering the Property and issued in Buyer's name and for its benefit from a reputable title insurance company, showing good and marketable title on the date of issuance of binder in Seller, free from restrictions or zoning prohibiting the development of the Property for the use as a service station and general merchandising business, and * * *"
Tenneco alternatively claims that assuming that they breached the agreement, plaintiff suffered no damages since plaintiff subsequently conveyed the property to third parties for a reasonable profit (approximately $55,000.00) within a relatively short time from the date of purchase. It is defendant's position that plaintiff sold the property at a fair market value and, accordingly, suffered no loss or damages.
Plaintiff contends, on the other hand, that the provisions of the option agreement relied on by defendant restricting the use of the property are contained in the printed part of the agreement, and, that certain typewritten clauses added to the agreement recognize the restrictive covenants but indicate Tenneco's intention to purchase the property irrespective of the restrictive covenants. The language in Sec. 5 of the option upon which plaintiff relies is as follows:
"* * * The title insurance binder and all supplements thereto shall be without exceptions or limitations, save and except the delivery of a properly executed warranty deed from Seller to Buyer as provided in this agreement and except such/other exceptions or limitations as may be acceptable to Buyer, and except for restrictive covenants dated 11/19/69, by Act before Claude Champagne, N.P., registered C.O.B. 698A, Folio 112."
Plaintiff further supports his interpretation of the option with the following language contained in Sec. 8 of the option which was also typewritten and reads as follows:
"* * * Notwithstanding any provision hereof, Buyer agrees to take title subject to the restrictive covenants referred to in paragraph 5 hereof, a copy of these covenants are attached hereto and made a part hereof."
According to plaintiff's interpretation of the language in Sec. 5 quoted herein above and the language in Sec. 8 of the option agreement, Tenneco agreed to take title to Lot 2A "subject to the restrictive covenants referred to in paragraph 5." It is plaintiff's position that if a conflict exists in the language of the option, the typewritten part of the agreement prevails over contradictory printed matter.
In connection with plaintiff's claim for loss of profits, it is plaintiff's position that *320 less than market value was received by plaintiff from a subsequent sale to third parties. Plaintiff claims this loss occurred because the subsequent sale was forced by reason of defendant's breach since plaintiff had to meet an impending due date on an outstanding note bearing against the property in the sum of $335,000.00 and was relying on the amount to be received from the sale to Tenneco to pay on the outstanding note. Plaintiff further claims the subsequent sale of the property was not an arm's length transaction and did not accurately reflect the true market value of the property. In seeking to have the judgment of the trial court affirmed, plaintiff contends the amount of the award for loss of profits was based upon a credibility determination by the trial judge after hearing the testimony of an appraiser for plaintiff and an appraiser for defendant. According to plaintiff, the trial judge chose to accept the testimony of plaintiff's appraiser which is that plaintiff suffered a loss of profit in the sum of $56,981.00 as a result of defendant's breach and chose not to accept testimony of defendant's appraiser which is that plaintiff suffered no loss of profit.
Defendant denies it is guilty of a breach of its contract to purchase. Alternatively, defendant claims if it is guilty of any breach, plaintiff failed to show any loss of profits as a result of the breach.
On the question of loss of profits, defendant takes the position that plaintiff's appraiser arrived at an evaluation of the loss based on error in calculations and failed to recognize and take into consideration the subsequent sales of comparable property in the area of the property in question.

BREACH OF AGREEMENT
It is clear from the printed wording in See. 5 of the Option to Purchase that the purchaser recognizes the existence of restrictions on the property. The additional typewritten provisions in Sec. 5 and Sec. 8 are not at variance with the printed wording of the option but are exceptions to the restrictions recognized in the option. The effect of the added typewritten part of the option is that Tenneco agreed to take title to the property subject to the restrictions or irrespective of the restrictions.
Furthermore, the title company agreed, before the date specified for the sale, to issue a binder insuring the use of the property as a service station if a court decided that the property could not be used for such purpose. Accordingly, we conclude defendant breached the option agreement when it refused to take title. Tenneco is answerable in damages resulting from the breach.

DAMAGES
We are next confronted with the nature and extent of damages to which plaintiff is entitled as a result of defendant's breach. It was stipulated that the cost for resubdivision, taxes and interest totalling the sum of $4,921.79 are to be assessed as special damages in the event that plaintiff prevails. The real dispute is whether plaintiff is entitled to loss of profits from a subsequent sale of Lots 2A and 2B of Square "F",[3] and the amount and extent of the loss, if any was, in fact, suffered.
LSA-R.C.C. art. 1934 provides:
"Where the object of the contract is anything but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived, under the following exceptions and modifications:
"1. When the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract. *321 By bad faith in this and the next rule, is not meant the mere breach of faith in not complying with the contract, but a designed breach of it from some motive of interest or ill will.
"2. When the inexecution of the contract has proceeded from fraud or bad faith, the debtor shall not only be liable to such damages as were, or might have been foreseen at the time of making the contract, but also to such as are the immediate and direct consequence of the breach of that contract; but even when there is fraud, the damages can not exceed this."
We draw from a reading of this article that if the debtor is not in bad faith, the creditor is entitled to loss of profits that were contemplated or foreseen by the parties at the time of the agreement. In the event that the breach is in bad faith or fraudulent, the debtor shall not only be liable for foreseeable damages at the time of the making of the contract but also those damages that are the immediate and direct consequence of the breach of the contract.
From our review of the record we cannot conclude that defendant was in bad faith in breaching the contract. LSA-R. C.C. art. 1934 defines a "bad faith breach" as one resulting from some ill design or motive. We are not in agreement with plaintiff's contention that bad faith was evidenced by Tenneco's failure to have a representative appear at the sale, or by their request for an additional 30 to 60 days in which to take title to the property without payment of additional consideration or by their offer to pay $140,000.00 for the subject property which is $10,000.00 less than the option price.
Since defendant's breach was not in bad faith, plaintiff is entitled only to the loss of profits which was contemplated or foreseeable by the parties at the time of the making of the contract. Those losses need not be proved with absolute certainty, nevertheless, they cannot be conjectural or uncertain. See Jolley El. Co. v. Schwegmann Bros. Giant Super Mkts., 230 So.2d 640 (La.App., 4th Cir. 1970), writ refused, 255 La. 813, 233 So.2d 251 (1970).
Our consideration of the record leads us to a conclusion that the subsequent sale of the property upon which defendant had an option to purchase (Lot 2A of Square "F") resulted in a foreseeable loss on that property for which plaintiff is entitled to be compensated. Clearly, it was reasonably foreseeable that plaintiff intended to realize a profit from the sale of Lot 2A to defendant.
Furthermore, the record supports the conclusion of the trial judge that defendant's breach compelled plaintiff to sell the property under forced conditions for less than market value resulting in a loss. Plaintiff purchased Square "F" on August 31, 1970, at a cost of $327,862.00. On the same day, plaintiff borrowed from a local bank the sum of $335,000.00 and signed a note payable on May 31, 1971, bearing 10% interest. In contemplation of the sale of Lot 2A to defendant, plaintiff incurred the additional expenses of $4,921.79 which included the cost of resubdivision and taxes.
According to Galloway, the funds that were to be derived from the sale of the property to Tenneco, i. e., $150,000.00, were to be used to retire part of the indebtedness owed to the bank. Because of the aborted sale, plaintiff was placed in a tenuous and uncomfortable position of having a substantial note due without being able to reduce the principal amount of the note on the due date. Galloway testified that this sale to Tenneco was "crucial" to the development of the remaining area.
Remus Hebert, the officer of the lending institution who negotiated the loan with plaintiff, stated that the bank was in a "tight" money situation and the bank "relied" on the representation made by plaintiff for payment at the time of the maturity of the note. Hebert testified that the bank would have been pushing to get this loan paid out. Under the circumstances, we conclude that plaintiff was placed in a precarious financial position as a result of the breach and because of the impending due date on the outstanding note.
*322 Finally, on May 28, 1971, just three days before the expiration date of the note, plaintiff sold Square "F", which includes Lot 2A and Lot 2B, for the price of $383,669.00. According to the testimony of Peter Talluto, plaintiff's appraiser, this price was below the fair market value.
Because of defendant's breach and plaintiff's resulting financial position, we conclude that the sale was not freely negotiated, but was in the nature of a forced sale. As a result, we conclude that plaintiff was deprived of profits which might have been derived from the sale of the property had the sale not been forced.

EXTENT OF LOSS
With regard to proof of the extent of loss of profits, Talluto testified the fair value at the time of the sale by plaintiff was the sum of $440,650.00. Therefore, Talluto calculated the loss of profits incurred by plaintiff on the sale of Square "F" was the sum of $56,981.00. Talluto based this figure on a $5.00 per square foot value for Lot 2A and a $2.00 per square foot value for the remainder of Lot 2B of Square "F". This expert used three comparable sales in the area of the subject property.
E. A. Tharpe, defendant's appraiser, agreed with Talluto that the value of Lot 2A is $5.00 per square foot. However, he valued the remaining part of Square "F", i.e., Lot 2B, at $1.60 per square foot. According to Tharpe, plaintiff suffered no loss of profits as a result of the breach.
The trial judge placed reliance on the testimony of Talluto and rendered a judgment in favor of plaintiff in accordance with the evaluation of loss of profits as determined by him. He rejected the no loss of profits concept advanced by Tharpe.
We cannot say that the trial judge erred in placing more reliance on the testimony of Talluto. However, in accepting the loss as computed by Talluto in the amount of $56,981.00, the trial judge erroneously permitted recovery for losses on Lots 2A and 2B of Square "F". From our interpretation of LSA-R.C.C. art. 1934, plaintiff is entitled only to those losses, when no bad faith breach occurs, which "may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract." It is clear from the language of the codal provision that plaintiff is entitled only to recovery for the loss sustained on Lot 2A of Square "F" since this was the portion of the property upon which defendant had an option to purchase.
Based upon Talluto's testimony, we compute the loss to which plaintiff is entitled on Lot 2A to be the sum of $19,800.78. In order to compute the loss of profit to plaintiff, it is necessary to arrive at the proportionate loss on Lot 2A as it relates to the entire square. This is computed by dividing the market value of Lot 2A ($153,125.00) by the market value of the entire square as computed by Talluto ($440,650.00), which results in the percentage value that Lot 2A bears to the market value of the entire square (34.7498%). Thirty-four point seven four nine eight percent (34.7498%) of the loss of the entire square ($56,981.00) amounts to $19,800.78the loss of profit sustained by plaintiff on Lot 2A.
Accordingly, the judgment in favor of plaintiff is amended to reduce the amount of the award for loss of profits from $56,981.00 to $19,800.78. When the stipulated damages totaling $4,921.79 are added to the $19,800.78 sum, plaintiff is entitled to recovery in the total amount of $24,722.57.
Accordingly, the judgment is amended and recast as follows. Judgment is now rendered in favor of plaintiff, William F. Galloway, Jr., and against Tenneco Oil Company, defendant, in the sum of $24,722.57, with interest from date of judicial demand. Costs are to be paid by defendant. As amended, the judgment is affirmed.
Amended and affirmed.

See Appendix on next page
*323 
NOTES
[1] See Appendix.
[3] The option agreement involved only Lot 2A of Square "F". However, the trial judge awarded loss of profits from the sale of the whole of Square "F".