**SCHWEGMANN GIANT SUPER MARKETS d/b/a Caillouet Farm**

v.

**GOLDEN EAGLE INSURANCE COMPANY.**

Civ. A. No. 88–0008.

United States District Court, E.D. Louisiana.

Aug. 25, 1988.

Randall A. Smith, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for plaintiff.

John Person, Middleberg, Riddle & Gianna, Metairie, La., for defendant.

## ORDER AND REASONS

CHARLES SCHWARTZ, Jr., District Judge.

This matter is before the Court upon its own initiative to give written reasons why it applied Mississippi law to the matter and why it did not give certain requested jury charges and interrogatories to the jury.

This is a diversity insurance case that was tried before a jury. The sole issue for the jury to decide was the value at time of death of plaintiff's horse insured under defendant's insurance policy. The jury deter-mined that this value was identical to the policy limit of $240,000.

Below, the Court addresses five points: (1) why Mississippi law was the substantive law controlling the matter, (2) why defendant was not entitled to a "false representations" charge, (3) why plaintiff was not entitled to a "consequential damages" charge, (4) why plaintiff was not entitled to a "punitive damages" charge, and (5) why plaintiff was not entitled to a "pre-judgment interest" charge or to pre-judgment interest.

Having considered the evidence presented, the record, and the applicable law, the Court rules as follows pursuant to F.R.Civ. P. 52. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as conclusions of law; to the extent any of the following conclusions of law constitute findings of fact, they are adopted as findings of fact.

## I. FINDINGS OF FACT

### A.

In June 1984, plaintiff (Caillouet Farm) purchased from a Mr. Allen E. Faulkner for $120,000 a one-half interest in a horse. *See* Exhibit P–1. In January 1985, plaintiff and Mr. Faulkner made a further deal over Mr. Faulkner's remaining one-half interest: plaintiff would pay Mr. Faulkner $120,000 for this remaining interest, but only after the completion of the 1987 breeding season. *See* Exhibit P–3. On November 12, 1986, before the completion of this season, the horse died, apparently of natural causes. Thus, plaintiff explained, it never paid the second $120,000 for the horse.

Effective June 19, 1986, plaintiff took out a one-year horse mortality insurance policy from defendant (Golden Eagle Insurance Co.) for a face amount of $240,000, the alleged purchase price and value of the horse. Pursuant to paragraph 2(B) of the policy, plaintiff represented to defendant that plaintiff was "the sole and unconditional owner of the horse and no other partner, partners, part owner, part owners, person or persons or entity ha[d] any interest therein."

After the horse died and plaintiff later submitted a notarized, sworn proof of loss form pursuant to paragraph 18 of the policy, defendant investigated the value of the horse. Soon thereafter, on March 6, 1987, defendant offered plaintiff $75,000 to settle the claim. A full month later, plaintiff's attorney finally replied, rejecting the offer. Further explaining its position, defendant again renewed its offer, which plaintiff again rejected, and then on May 14, 1987 held a telephone conference with plaintiff's attorney. By letter dated May 17, 1987, defendant mailed plaintiff's attorney a check for $75,000, which plaintiff could accept with both sides reserving all rights, and offered to arbitrate the parties' dispute as to the dead horse's value. Plaintiff accepted the check (by endorsing it to a third party) but refused to arbitrate. Not until almost a half a year later, on November 11, 1987, did plaintiff bring the instant suit against defendant.

### B.

Caillouet Farm is a 520–acre farm located in Poplarville, Mississippi. The farm is used to breed and raise show horses. With a caretaker's house, a guest house, large stables, a "mare motel," and other improvements, the farm's property value exceeds $1 million. *See* Exhibits P–23 (photograph from *Southern Horseman* 53 (Jan. 1986) of Caillouet Farm), D–43 (another photograph). The farm employs five permanent employees in addition to a Manager, who with a caretaker lives on the farm. During the breeding season, the farm may have up to 200 horses on it at a single time.

Once plaintiff bought its initial one-half interest in the horse from Mr. Faulkner, it kept the horse exclusively at the farm (except for the times when the horse was on the road for a horse show). *See also* Exhibit D–27 (insurance application, wherein it is written: "[The horse is c]hiefly kept on premises known as Caillouet Farm ... Poplarville MS."). When plaintiff would breed this horse to mares, it would do so exclusively at the farm. Further, the horse died at the farm. There was no evidence that the horse at issue (or for that matter, any other horse owned by plaintiff) was ever in

Louisiana, except perhaps when it was passing through to or from a horse show.

Overseeing the farm and its horses (including the horse at issue) is its namesake, Alvin J. Caillouet. Mr. Caillouet does not live on the farm or in Mississippi, but rather—like many of those with property in Poplarville—lives in the New Orleans area. From time to time, as one would expect of most any businessman, he gives his New Orleans phone number or address in connection with the Mississippi farm business.

The entity Caillouet Farm is the business name for the Mississippi horse operations of Schwegmann Giant Super Markets, a Louisiana partnership with its principal place of business in Louisiana. In its dealings with defendant and others in the horse industry, Caillouet Farm's formal or legal connection with Schwegmann is not routinely or even occasionally disclosed; it is occasionally revealed, however, that Mr. Caillouet himself lives in Louisiana and works for Schwegmann. According to Mr. Caillouet, the farm manages its own affairs (although at least some of its bills are paid from Schwegmann's office in Metairie, Louisiana) and is under a strict budget to operate as close to even as possible; in short, Schwegmann treats the farm much like a separate subsidiary corporation: the affairs are kept distinct, with the main concern of the parent in the subsidiary being gain (or loss) of income by the subsidiary.

Plaintiff's dealings with others in horse industry are solely as an entity operating exclusively from Mississippi. In its promotion literature, plaintiff solely gives its Poplarville address and appears never to disclose formally any connection with Schwegmann or with Louisiana. *See* Exhibits P–25 (advertisements in *Quarter Horse Journal* and *Southern Horseman*), D–43 (plaintiff's auction catalogue). Plaintiff's breeding contracts in evidence were all executed in Mississippi and all provide that Mississippi law applies, even for a contract where the mare owner was also a Louisiana resident. *See* Exhibit D–29. Some of plaintiff's stationery gives a New Orleans post office box number and New

Orleans area phone numbers in small print in addition to the much more prominently displayed Mississippi address. *See* Exhibits D–28, D–29. These numbers, however, appear to be Mr. Caillouet's personal numbers. *See* Exhibit D–28; *see also* Greater New Orleans Area South Central Bell Telephone Book 117 (Nov. 1987) (same phone number; not listing on any page a number for Caillouet Farm).

There is hardly an indication in the record showing that defendant in any way knew or should have known that Caillouet Farm—as opposed to Mr. Caillouet individually—had any connection with Schwegmann or with Louisiana. There was no evidence presented that Mr. Caillouet or anyone else ever explicitly informed defendant that plaintiff was anything but a Mississippi entity. The purchase of the horse from Mr. Faulkner was in the name of Caillouet Farm, not Schwegmann. *See* Exhibits P–1, P–3. Telexes leading to the obtaining of insurance mention only Caillouet Farm, not Schwegmann. *See* Exhibits P–4 to P–9, P–12. The insurance policy was issued in Caillouet Farm's name. *See* Exhibit P–13. Almost all the documentary evidence concerning the relationship between plaintiff and defendant gives plaintiff's Mississippi address. *See* Exhibits P–16 (proof-of-loss form signed by Mr. Caillouet), P–15 (letter from defendant's adjust-er to plaintiff), P–17 (same), D–27 (plaintiff's insurance application), D–47 (insurance agent's letter to plaintiff), D–48 (declaration page of insurance policy).

The sole documents concerning the horse to list a New Orleans address—both giving Mr. Caillouet's post office box—are two letters to Mr. Caillouet individually. *See* Exhibits P–37, P–38; *cf.* Exhibits P–39, P–40 (two documents dated after the instant insurance policy was issued and concerning other horses; using Mr. Caillouet's post office number for the mailing address). Thus, while defendant may have been aware of Mr. Caillouet's personal connection with Louisiana, *see* Exhibits P–37 to P–40, and with Schwegmann, *see* Exhibit P–4, no evidence was presented that defendant knew, or that a reasonable person in defendant's position would have or should have known, that plaintiff itself (as opposed to its overseer, Mr. Caillouet) had any formal, legal connection with Louisiana or the undisclosed principal, Schwegmann.

## II. CONCLUSIONS OF LAW

### A. *Choice of Law* [1]

■ Plaintiff argues that Louisiana law applies, while defendant argued that Mississippi law applies.[2] As explained below, defendant is correct.

---

1. Plaintiff's counsel evidently did not perceive the choice-of-law issue in this matter until defendant's counsel specifically brought the issue to his attention just before the pre-trial order was due. Plaintiff's counsel asserts that it would be "patently unfair" to consider this issue. The Court must wholly reject this misconception of procedure by plaintiff's counsel. Contrary to the inference by plaintiff's counsel, the controlling facts that govern the choice-of-law in this case were known to all counsel months before the final pre-trial conference in June 1988. As defendant's counsel suggested at the conference, he had no duty prior to the submission of the pre-trial order to inform plaintiff's counsel that the record and evidence revealed a genuine *legal* issue from these *facts*. Further, as his two memoranda on the issue reveal, plaintiff's counsel had more than sufficient time between the final pre-trial conference and the trial to prepare for this issue at trial. In sum, it is proper for this Court to address the merits of the choice-of-law issue.

2. The difference between the two laws appears significant in several respects: (1) plaintiff contends that pursuant to La. RSA § 22:667 as applied to the policy at issue, defendant must pay the face value of the policy instead of the actual value of the horse as provided for in paragraph 6 of the insurance policy; (2) the standard for *statutory penal damages* under La. RSA § 22:658 differs from the perhaps slightly stricter standard for punitive damages under Mississippi common law; and (3) pre-judgment interest is mandatory under Louisiana law, whereas it is discretionary under Mississippi law.

 Because the jury found that the dead horse's actual value was $240,000, which amount equals the policy limits, resolution of the conflict-of-laws dispute might appear less urgent than it was before the jury's verdict. Resolution is, nonetheless, still appropriate inasmuch as (1) there remain still the different rules of interest and (2) defendant may be entitled to a new trial from this Court under F.R.Civ.P. 59—the Court expresses no opinion on this issue, but merely

■ Following *Erie,* a federal court sitting in diversity cases must apply the choice-of-law rules of the state in which it sits. *E.g., Atlantic Mutual Insurance Co. v. Truck Insurance Exchange,* 797 F.2d 1288, 1291 (5th Cir.1986); *see Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, this Court must apply Louisiana's choice-of-law rules.

■ La.Civil Code article 15 (formerly numbered as art. 10) reads in pertinent part as follows:

> The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed.

Because the insurance policy at issue was delivered, or "passed," to plaintiff in Mississippi, a literal reading of article 15 suggests that this Court's choice-of-law task is easily disposed of: the express statute directs that Mississippi law applies. *See also Eicher–Woodland Co. v. Buffalo Insurance Co. of New York,* 198 La. 38, 3 So.2d 268, 271 (1941). Despite the ease and logic of this approach, however, Louisiana courts have not so construed article 15; as the Fifth Circuit explained after a thorough review of the confused status of Louisiana conflicts law:

> [T]he current approach to the choice of law in Louisiana is that embodied in the *Restatement [ (Second) of Conflict of Laws § 6 (1969) ]* and ... under that approach the interest analysis of the second paragraph of the *Restatement* is to be applied in all cases, regardless of the literal reach of Article 1[5].

*Lee v. Hunt,* 631 F.2d 1171, 1176 (5th Cir. Unit A 1980), *cert. denied,* 454 U.S. 834, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981); *see also Bell v. State Farm Mutual Automobile Insurance Co.,* 680 F.2d 435, 436 (5th Cir.), *cert. denied,* 459 U.S. 1088, 103 S.Ct. 572, 74 L.Ed.2d 934 (1982).

■ Louisiana's conflict rules can be stated another way. If a "false conflict" exists between Louisiana law and another state's law, then a Louisiana court is to apply the substantive Louisiana law. *Lee,* 631 F.2d at 1175 (discussing *Jagers v. Royal Indemnity Co.,* 276 So.2d 309 (La.1973)); *Silver v. Nelson,* 610 F.Supp. 505, 513 (E.D.La.1985), *cited with approval in In re Air Crash Disaster New Orleans, La. on July 9, 1982,* 821 F.2d 1147, 1169 n. 38 (5th Cir.1987) (en banc). Otherwise, the court is to apply the substantive law of whichever of the two states has "the greater interest" in, or "the more significant relationship" to, the dispute-at-issue under the *Restatement* approach. *Lee,* 631 F.2d at 1176; *Air Crash,* 821 F.2d at 1169 n. 38; *Silver,* 610 F.Supp. at 513. As explained below, the Court finds a "true conflict" between Louisiana and Mississippi law and that Mississippi has by far the greater interests in the application of its law to this lawsuit.

Mississippi has the interest in promoting a fair and honest horse industry so as to encourage others to raise and breed horses in Mississippi. By establishing a rule that a policy holder for an insured horse cannot recover for more than the value of the horse (especially when the insurance policy explicitly and clearly states such), *see Townsend v. American Excel Insurance Co.,* 661 F.Supp. 102, 103 (N.D.Miss.1986), *aff'd without written opinion,* 818 F.2d 863 (5th Cir.1987); *Cherry v. Anthony, Gibbs, Sage,* 501 So.2d 416, 418–19 (Miss. 1987), Mississippi is able to help implement a policy against fraudulent overvaluation. By upholding actual value provisions, Mississippi law helps negate the attempts by some in the horse industry to sell horses on questionable "deferred payment" plans so as to make the value of the horse appear on paper as being higher than the horse's actual worth. In sum, Mississippi has an interest in seeing that an insured person be paid for the value of its insured property in accordance with the express terms of the insurance policy it makes, but not for a higher or lower amount.

Further, by enforcing actual loss provisions, Mississippi law (1) permits insurance

notes that such remains a possibility at this time—or from the Fifth Circuit on a remand

from an appeal.

companies to be at lesser risks otherwise and (2) assures insurance companies that fraudulent and even mistaken overvaluations by policy holders are not to go unremedied. Both elements encourage insurance companies to do business in Mississippi. Without doubt, Mississippi has an interest in encouraging insurance companies to do business in Mississippi.

In short, application of Mississippi law will advance its policies in not adopting non-actual value statutes similar to La. RSA § 22:667. Thus, to the extent that Mississippi law conflicts with Louisiana law, *see supra* note 2, there is a "true conflict." The Court must therefore determine whether to apply substantive Mississippi or Louisiana law.

■ The controlling facts, set forth in Part I(B) above, largely speak for themselves: Mississippi is the state with the overwhelming interests in this case. Thus, the Court applies Mississippi law as the substantive law to this case.

The sole connections between Louisiana and the case are (1) that the action was brought here and (2) that Caillouet Farm's undisclosed principal, Schwegmann, happens to be a Louisiana entity. These connections are wholly insufficient to warrant the application of Louisiana law.

Plaintiff operated its horse business as a wholly-Mississippi located entity. The sole address it gave defendant on any of the forms and applications it completed in relationship to the insurance policy was the Poplarville address. The policy was delivered to plaintiff in Mississippi. The business enterprise affected by the payment or nonpayment of the claim under the policy is not the super market business in Louisiana, but the horse business in Mississippi. *See Burns v. Holiday Travels, Inc.*, 459 So.2d 666, 668 (La.App. 4th Cir.1984).

■ That an employee at the farm may have forwarded the policy and the correspondence related thereto to Schwegmann's office—all of which was done unilaterally, without defendant's knowledge or consent—is of little import. *Cf. World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (a plaintiff cannot establish personal jurisdiction in an action over a product merely by bringing the product into the state). Further, that defendant may have been aware that Mr. Caillouet himself resided in Louisiana and worked for Schwegmann is of little import as well, for no one contends that defendant was dealing with Mr. Caillouet individually. With its large facilities and permanent staff, Caillouet Farm has held itself open to the public as a Mississippi operation, not as a mere appendage identified with Schwegmann and Louisiana.

Further, plaintiff has shown the specific intent that Mississippi law apply to its horse business. Plaintiff's own breeding contracts, which are all on plaintiff's own forms, all provide for the application of Mississippi law.

■ Plaintiff suggests that it is significant that under paragraph 7 of the policy ("The HORSE is covered anywhere in and in transit within the United States of America and Canada."), the horse was insured in Louisiana. The Court disagrees. This paragraph in the policy gives no more reason for applying Louisiana law than it does for applying Alabama law or even Delaware or Saskatchewan law.

■ Plaintiff also suggests that it is significant that defendant did not object to personal jurisdiction or venue in this district. The Court again disagrees. Plaintiff confuses the distinction between a state's constitutional power to apply its own law to cases brought in its forum and the actual choice-of-law principles the state follows. While the application of Louisiana law to this case may perhaps be permissible under the federal constitution, *see generally Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818–23, 105 S.Ct. 2965, 2977–80, 86 L.Ed.2d 628 (1985); *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981), Louisiana—for strong policy reasons, *cf. Phillips*, 472 U.S. at 331, 101 S.Ct. at 650 (Stevens, J., concurring) (regarding "the Minnesota courts' decision to apply forum law as unsound as a matter of conflicts law")—does not purport to ex-

ert its choice-of-law rules in favor of Louisiana law to the full extent allowed under the constitution. Stated another way, plaintiff's argument is but a bootstrap argument: choice-of-law questions may only arise in cases where personal jurisdiction over the defendant is present; otherwise, the court must dismiss the case before it reaches the merits of the substantive dispute in the case. *Cf. id.* at 317 n. 23, 101 S.Ct. at 642 n. 23 ("examination of a State's contacts may result in divergent conclusions for jurisdiction and choice-of-law purposes"). A cursory review of the Louisiana state cases concerning choice-of-law issues shows that the existence of personal jurisdiction or proper venue plays no part in its *Restatement* approach to choice-of-law issues. *See, e.g., Powell v. Warner,* 398 So.2d 22 (La.App. 4th Cir.1981) (applying Mississippi law).

### B. *No False Representations*

 Both parties submitted jury charges and interrogatories on the issue whether plaintiff violated paragraph 2(B) of the insurance policy—thereby making the policy null and void *ab initio*—by not informing defendant of the agreement between plaintiff and Mr. Faulkner for the second one-half interest in the horse.

 It is undisputed that plaintiff did not inform defendant of, and that defendant was unaware of, this agreement prior to the horse's death. What the parties dispute is whether under the agreement, Mr. Faulkner remained a part owner of the horse. This dispute is not a factual one that a jury may resolve, but instead a wholly legal one that the Court must resolve. Thus, no matter what the resolution of the issue, it would have been inappropriate for the Court to pose interrogatories to the jury on this issue. Further explaining why the Court denied defendant's motion at trial for a directed verdict, the Court now resolves this dispute in plaintiff's favor.

 To determine whether Mr. Faulkner retained an ownership interest in the horse after he made his second agreement with plaintiff, the Court must turn to the Mississippi law on the sale of goods (viz., Mississippi's version of Article 2 to the Uniform Commercial Code, Miss.Code Ann. tit. 75, ch. 2 (1972)).[3] *Key v. Bagen,* 136 Ga.App. 373, 221 S.E.2d 234, 235 (Ga.App. 1975) (purchase of a horse is covered by Article 2); *see* UCC § 2–105 (defining "goods" covered by Article 2); *cf. Vince v. Broome,* 443 So.2d 23, 26 (Miss.1983) ("goods" covered by Article 2 include cattle).

A brief scan through Article 2 shows that Mr. Faulkner retained no interest in the horse at the time the insurance policy was issued. If plaintiff as buyer had breached its agreement with Mr. Faulkner as seller, then the sole remedies for Mr. Faulkner would have been those enumerated in UCC § 2–703. While an aggrieved seller may generally retain possession of the goods-at-issue as a remedy for a buyer's breach, *see* UCC §§ 2–703(a), 2–705, 2–706, this remedy would have been unavailable in this instance inasmuch as plaintiff already had possession of the horse. Thus, the sole remedy for Mr. Faulkner as an aggrieved seller would have been an action for money damages only, specifically, an action for the price under UCC § 2–709. Mr. Faulkner would have become a general, unsecured creditor, without a right to take back the horse if plaintiff could satisfy his debt otherwise. Nor would he have had any secured rights under Article 9 of the UCC, for no document was recorded in accordance with Article 9's provisions to perfect a security interest in a movable good. Further, absent an express agreement to the contrary, where delivery of the goods-at-issue is to be made without moving the goods-at-issue, title to the goods-at-issue passes at the time and place of contracting. *See* UCC § 2–401(3)(b). Thus, title passed in January 1985, when

---

**3.** Defendant cites the Court to *Neyland v. Neyland,* 482 So.2d 228 (Miss.1986) (holding that parents who informally lent money to their son and daughter-in-law for construction of a house retained an equitable lien on the house). *Ney-* *land* is inapplicable, as it concerns interests in real estate and immovable property (governed by Mississippi common law on property) instead of, as here, interests in a movable good (governed by the UCC).

plaintiff and Mr. Faulkner made their agreement.

In sum, Mr. Faulkner retained no interest, security or otherwise, in the horse at the time the insurance policy was made. Thus, plaintiff had no duty under paragraph 2(B) of the policy to inform defendant of the agreement between plaintiff and Mr. Faulkner.[4]

### C. *No Consequential Damages*

■■■ Plaintiff argued that it was entitled to any lost profits, or lost opportunity costs, it sustained as a consequence of defendant's failure to timely pay under the policy. As explained below, the Court disagrees.

First, from the old English case of *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854), onward, it has been well established, almost universally, that a party to a contract cannot recover consequential damages from a breach of that contract unless the consequences were contemplated under the contract at the time the contract was made. *See Wright v. Stevens*, 445 So.2d 791, 797 (Miss.1984). Nowhere in the policy at issue do the parties provide any contemplation that plaintiff could recover any "lost profits." If plaintiff had intended to recover such, it should have demanded a policy, from defendant or another insurer, that expressly provided for recovery of such.

Second, the three cases plaintiff cites do not support plaintiff's position. *Nat Harrison Associates, Inc. v. Gulf States Utilities Co.*, 491 F.2d 578 (5th Cir.1974), and *Galloway v. Tenneco Oil Co.*, 313 So.2d 317 (La.App. 4th Cir.), *writs denied*, 318 So.2d 42 (1975), both repeat the general rule in sales contracts that a seller's damages for a buyer's breach is the difference between the sale price of the goods and the cost of the goods to the seller. While this

general rule is certainly a rule for recovery of "lost profits," it is not the kind of "lost profits" plaintiff wants to recover. In sales contracts, the seller's bargain is "the profit from the sale," but in insurance contracts, the insured's bargain is "the amount of insurance under the policy." Paragraph 6 of the parties' policy provides that the amount of insurance is solely the actual value of the horse, up to the policy limits. *South Central Bell v. Epps*, 509 So.2d 886 (Miss.1987), concerns tort damages of mental anguish from the telephone company's improperly cutting off a customer's telephone line; nowhere does it mention anything about "lost profits" from breach of a contract, insurance or otherwise.

Third, plaintiff neither presented nor proffered any evidence of what these "lost profits" amounted to. Even if the insurance policy provided for such, none could be awarded inasmuch as such damages "may not be established by speculation or conjecture." *Wright*, 445 So.2d at 798.

Finally, to permit "lost profits" as plaintiff defines them would create a rule of law that would permit some plaintiffs double recovery. To the extent Mississippi law deems it appropriate for a successful plaintiff to recover such "lost profits," it awards such in the form of pre-judgment interest. While plaintiff may not recover such interest in this case for the reasons explained in Part II(E) below, this Court is not entitled to disregard Mississippi's rules (for when to award and when not to award pre-judgment interest) by calling an award for such interest "lost profits."

### D. *No Punitive Damages*

■■■ Under very limited circumstances under Mississippi law, an insured person may collect punitive damages from his insurer for the insurer's failure to pay under a policy.

To the extent that rules of law may guide a person's future conduct, the Court is confident that Golden Eagle and other insurance companies wary of the under-the-table dealings in the show horse industry—dealings that often hide the proper indicia for determining a horse's true value—will now require horse owners to provide them with more thorough disclosures on ownership histories of the horses they insure.

---

**4.** The Court is keenly aware of the dubious deals that often plague the show horse industry and questions the arm's-length aspect of a sale where a buyer owes absolutely no money to a seller if the value of the goods sold is lost almost two years after the sale. Without specific evidence of impropriety in this matter, however, the Court is not free to apply an equitable defense for the insurance company.

488

The Court must "first determine from all the facts of the case whether the issue of punitive damages should be submitted to the jury." *Bankers Life & Casualty Co. v. Crenshaw*, 483 So.2d 254, 269 (Miss. 1985) (citing *Reserve Life Insurance Co. v. McGee*, 444 So.2d 803 (Miss.1983); *Blue Cross & Blue Shield of Mississippi, Inc. v. Campbell*, 466 So.2d 833 (Miss.1985)), *aff'd*, — U.S. —, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988).

The Mississippi Supreme Court provides the following questions for determining whether a party may seek punitive damages:

> Was there an "intentional and unreasonable refusal" to pay a legitimate claim? Was there a *legitimate or an arguable reason* for failing to pay [the insured's] claim? Or, was there a "reasonably arguable basis, either in fact or in law, to deny the claim?"

*Id.* at 269 (emphasis in original; citations omitted).

Punitive damages must be denied where the insurance company "honestly contests the amount" owing to the insured. *Reserve Life*, 444 So.2d at 810 (citing *Henderson v. United States Fidelity & Guaranty Co.*, 620 F.2d 530, 536 (5th Cir.) (citing *Progressive Casualty Insurance Co. v. Keys*, 317 So.2d 396 (Miss.1975)), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980)); *accord SFI, Inc. v. United States Fire Insurance Co.*, 453 F.Supp. 502, 507 (E.D.La.1978) (applying Louisiana law), *aff'd*, 634 F.2d 879, 880 (5th Cir.1981). This is true, even where a jury determines the amount due to be higher than the amount the insurance company may have offered to pay in settlement. *See Magee v. Sheffield Insurance Co.*, 673 F.Supp. 194 (S.D.Miss.1987) (granting partial summary judgment dismissing punitive damage claim).

Because there was no evidence to support the punitive damage claim, the Court did not ask the jury to address this issue. From the beginning, defendant dealt with plaintiff in good faith. Defendant had already paid plaintiff $75,000 under the policy for the horse's death, which amount plaintiff did not refuse but instead accepted. *Accord O'Brian v. Allstate Insurance Co.*, 420 So.2d 1222, 1225 (La.App.3d Cir. 1982). As the conflicting evidence at trial illustrated, defendant had more than "a reasonably arguable basis ... in fact" for not paying plaintiff the full $240,000 it demanded. The Court merely adds that if it instead of the jury were to have decided the horse's value, it would probably have found the value to have been considerably closer to the $75,000 amount defendant originally tendered to plaintiff than to the well–over–$240,000 figure plaintiff's counsel argued at trial.

### E. *No Pre–Judgment Interest*

In diversity cases, issues of pre-judgment interest are governed by the applicable substantive state law. *Dunn v. Koehring Co.*, 546 F.2d 1193, 1201 (5th Cir.), *modified in part on other grounds on reh'g*, 551 F.2d 73 (5th Cir.1977) (per curiam). Thus, this Court must look to Mississippi law on pre-judgment interest.

Under Mississippi law, the trial judge determines whether such interest is to be awarded in an insurance case, even where the matter is tried before a jury. *See Commercial Union Insurance Company v. Byrne*, 248 So.2d 777, 782–83 (Miss.1971); *cf. Home Insurance Co. v. Olmstead*, 355 So.2d 310, 313–14 (Miss. 1978) (reversing district court's award of pre-judgment interest in a jury case). The Fifth Circuit has applied this rule equally to diversity cases. *See Charles Stores, Inc. v. Aetna Insurance Co.*, 490 F.2d 64, 70 (5th Cir.1974).[5] Thus, the Court did not instruct the jury on the rules for

---

**5.** This Mississippi rule is certainly different from the federal admiralty rule that the jury must decide whether pre-judgment interest is to be awarded. *See Morales v. Garijak, Inc.*, 829 F.2d 1355, 1361 (5th Cir.1987).

Without *Charles Stores*, this Court might have questioned whether, in light of *Byrd v. Blue*

*Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), federal courts should apply this Mississippi rule. While *Charles Stores* (like the other federal cases addressing this rule) makes no explicit reference to *Byrd*, this Court is bound by *Charles Stores* and thus applies the Mississippi rule.

pre-judgment interest and did not pose jury interrogatories thereon.

The decision to award pre-judgment interest in an insurance dispute case lies within the district judge's discretion where in the judge's opinion the facts and circumstances justify the allowance of interest. *Western Line Consolidated School District v. Continental Casualty Co.*, 632 F.Supp. 295, 305 (N.D.Miss.1986) (citing *Dunn*, 546 F.2d at 1201; *Charles Stores*, 490 F.2d at 70; *Commercial Union*, 248 So.2d at 783); *Aetna Casualty & Surety Co. v. Doleac Electric Co.*, 471 So.2d 325, 331 (Miss.1985). A review of the controlling cases, however, illustrates that this discretion is very circumscribed. A court may not award pre-judgment interest if there is no statutory or contractual provision for such, no proof sufficient to establish a claim for punitive damages (i.e., no sufficient evidence of bad faith by the insurer), and no liquidated claim at issue. *Stanton & Associates v. Bryan Construction Co.*, 464 So.2d 499, 502, 504 (Miss. 1985); *see Aetna Casualty*, 471 So.2d at 331. In essence, then, Mississippi law holds that a plaintiff's loss from a delay in the use of his money (or, in plaintiff's words, "lost profits") is not the controlling factor for determining whether to award pre-judgment interest.

Although dicta in some cases suggest that pre-judgment interest may be awarded wherever there are liquidated claims (of which there are none in this case), these same cases suggest that a parallel finding of bad faith ought also exist before a court may award pre-judgment interest. *See Home Insurance*, 355 So.2d at 313–14; *State Farm Mutual Automobile Insurance Co. v. Bishop*, 329 So.2d 670, 673 (Miss.1976) ("We held in *Commercial Union* ... that when there is a justifiable dispute as to the amount due, an insured is not entitled to interest until the amount due under the contract is made certain or liquidated unless the trial court in its discretion finds that the facts and circum-

stances of the particular case justify the allowance of interest prior to judgment."). *But cf. Davis v. Continental Casualty Co.*, 560 F.Supp. 723, 729–30 (N.D.Miss. 1983) ("Since the amount of the claim is liquidated and we find no equities existing in favor of defendant to excuse it from making prompt payment, this is a proper case for the allowance of prejudgment interest"); *Western Line*, 632 F.Supp. at 306 (same).

The central issue for determining whether to award pre-judgment interest has generally been whether the insurer's denial to pay the insurance claim upon proper demand was in bad faith or frivolous. *See Aetna Casualty*, 471 So.2d at 331; *Home Insurance*, 355 So.2d at 313–14 (reversing award of pre-judgment interest); *State Farm*, 329 So.2d at 673; *Commercial Union*, 248 So.2d at 783; *cf. Piney Woods Country Life School v. Shell Oil Co.*, 726 F.2d 225, 242 (5th Cir.1984) (same for an oil royalty contract), *cert. denied*, 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985). *But cf. Charles Stores*, 490 F.2d at 70 (making no suggestion of bad faith on the insurer's part and finding no abuse of discretion in awarding pre-judgment interest). Nonetheless, an award of pre-judgment interest is still not mandatory upon an express finding of bad faith. *See Dunn*, 546 F.2d at 1201 (finding no abuse of discretion in not awarding pre-judgment interest, even though punitive damages were properly awarded against the defendant contractor). *But see Western Line*, 632 F.Supp. at 305.

Under the facts and circumstances of the present case, the Court must exercise its discretion to disallow pre-judgment interest on plaintiff's award against defendant.[6] As the Court has already discussed in Part II(D) above, the record reflects a legitimate dispute as to the amount of damages. In other words, Golden Eagle was well-justified, and was not acting in bad faith or frivolously, in disputing the actual *amount*

---

**6.** If the Court were to conclude that pre-judgment interest was due, the interest would run, at the earliest, from February 14, 1987, which, in accordance with Paragraph 18 of the insur-

ance policy, is 30 days following plaintiff's submission of its notarized, sworn proof of loss. *See Davis*, 560 F.Supp. at 729–30.

of Caillouet Farm's unliquidated claim. *Aetna Casualty,* 471 So.2d at 331; *Stanton & Associates,* 464 So.2d at 504; *Commercial Union,* 248 So.2d at 783. Further, the Court cannot ignore that plaintiff waited until a day shy of one year after the horse's death to bring this action against defendant. *See Home Insurance,* 355 So.2d at 314.

### III. CONCLUSION

For these reasons, the Clerk of Court is hereby directed to enter final judgment in favor of plaintiff and against defendant in the amount of $165,000.00 ($240,000 awarded by the jury, less $75,000 already paid), together with legal interest from date of judgment, defendant to bear all costs.